Miles Ehrlich (Cal. Bar No. 237954)
miles@ramsey-ehrlich.com
Katharine A. Kates (Cal. bar No. 155534)
katharine@ramsey-ehrlich.com
RAMSEY & EHRLICH LLP
803 Hearst Avenue
Berkeley, CA 94710
Tel:     (510) 548-3600
Fax:    (510) 291-3060

*Attorneys for Defendant Hedley's Humpers, Ltd.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> HEDLEY'S HUMPERS, LTD., <br><br> Defendant. | Case No.: CR-14-00374 WHA <br><br> **DEFENDANT HEDLEY'S HUMPERS SENTENCING MEMORANDUM** <br><br><br> The Honorable William H. Alsup <br> Date: July 7, 2015 <br> Time: 2:00 p.m. <br> Place: Courtroom 8, 19th Floor |

### I.     PRELIMINARY STATEMENT

Hedley's Humpers, Ltd. (Hedley's or the "Company") is a shipping business in London, England that specializes in transporting fine arts and antiques from Europe to locations around the world. Until the charges in this case, Hedley's had operated for over 40 years with an unblemished record of legal compliance – both in its home country and elsewhere. The smuggling offense for which the company will now be sentenced arises from a sting operation conducted by the government in which a Napa art gallery owner – acting at the government's

direction – asked Hedley's to ship protected wildlife items (intended to be sold in Napa as *objets d'art*) from Europe to the U.S. using false descriptions on the shipping manifests and without the required license under the CITES treaty (the Convention on International Trade in Endangered Species of Wild Fauna and Flora). After some initial pushback, the Company acceded to the undercover request – a decision it deeply regrets, and one it readily acknowledges was an unacceptable violation of U.S. criminal law.

After accepting responsibility for the entirety of its misconduct, the Company moved swiftly to cooperate with U.S law enforcement in investigations of other organizations and individuals, which has included making its overseas employees available for government interviews, and providing foreign-located documents to government investigators. Recognizing the need for better training and compliance in the area of wildlife import regulations, Hedley's has also implemented a beefed-up compliance program to prevent future violations of the CITES treaty.

Although a strict guidelines application yields a somewhat higher fine range than agreed to in the Rule 11(c)(1)(C) plea agreement (a low of $175,000 per the guidelines, as opposed to the plea agreement's total monetary sanction of $100,000), the agreed-upon reduction is appropriate in view of the Company's cooperation with law enforcement, its swift acceptance of responsibility, the sporadic (rather than continuous) nature of the conduct, the relatively small financial gain associated with the offense, the passage of many years since the earlier incidents that preceded the sting operation, and several other mitigating factors that take this case outside the heartland of typical wildlife smuggling offenses.

We therefore join with the government and the Probation Office in requesting that the Court impose the agreed-upon sentence of 3 years of probation, a $75,000 fine, a community service payment of $25,000, and a $400 special assessment. Such a sentence would be "sufficient, but no greater than necessary" to achieve the statutory objectives in 18 U.S.C. §3553(a).

## II.     BACKGROUND

Stephen Hedley ("Steve" or "Mr. Hedley") founded Hedley's Humpers in 1973, in London, as a sole proprietorship. He started with a single moving van and £200 to his name. Having had some early experience in the antiques business, Mr. Hedley had encountered problems with transport, packing, and storage services; he thus saw a clear market opening for a logistics company capable of handling precious goods with proper care and attention. Mr. Hedley expanded the business over the decades to include the transportation, packing, storage, and installation of fine art, furniture, and antiques. It now has 93 employees with locations in London, Paris, and Avignon, France, and it ships items worldwide. Mr. Hedley remains the chief executive and owner of the company.

### A.  The Law Enforcement Raid on Polenske's Gallery and His Assistance in Launching the Investigation of Hedley's

The sole evidence of wrongdoing by Hedley's, and the basis for the charges, involved shipments Hedley's made for one of its clients named Michael Polenske. Polenske owns an upscale wine, arts, and antiques gallery in Yountville, California, named Ma(i)sonry. Among other objects offered for sale at Ma(i)sonry were certain wildlife items incorporated into (or displayed as) expensive artwork, such as mounted tortoise shells or whale ribs.

In October 2011, federal agents executed a search warrant at Ma(i)sonry looking for evidence of illegal wildlife trafficking. Following the raid, and during follow-up interviews with the government, Polenske informed law enforcement that, in the past, he had used Hedley's to ship artwork, antiques, and other collectibles he purchased in Europe (most of which did not involve protected wildlife). Polenske identified four previous shipments where he used Hedley's to ship protected wildlife items to his gallery, in which he directed Hedley's to falsely describe the items in the import documents. (PSR ¶ 14, NOAA report, US_1119-24, provided to probation by the government). The first of these improperly-labeled shipments occurred in 2006, a second in 2007, a third in 2008, and the fourth and final shipment in 2009. *Id.*

As the government acknowledges, the false labeling of wildlife items in each of these prior shipments occurred not at Hedley's initiative, but at Michael Polenske's request. *See* United States' Sentencing Memorandum at 1 ("*At M.P.'s request*, Hedley's Humpers falsely labeled the wildlife articles on the import documents.") (emphasis added); *id.* at 2 (These requests from Polenske were contained in emails that provided "*instructions to falsely label* sea turtle shells and other protected items as `sculptures.'") (emphasis added). Further, it was established that all of these past shipments (that four separate shipments that took place between 2006 and 2009) were handled by a *single employee* in Hedley's Paris office (Lalya Diabira), who confirmed in later interviews that she had carried out Polenske's requests to alter paperwork without consulting anyone else at Hedley's. Decl. of Katharine A. Kates In Support of Defendant's Sentencing Memorandum ("Kates Decl.") ¶ 2.

In 2012, after reviewing seized documents that appeared to confirm the information from Polenske, the government initiated a full-scale investigation of Hedley's. In August of 2012, as part of this investigation, NOAA Special Agent Nicholas Call requested that the U.S. Customs and Border Protection flag all of Hedley's shipments for enhanced review. Kates Decl. ¶ 3. Yet over the course of the next year, despite this enhanced scrutiny, the government identified no other instances of mislabeling or any other import violations by Hedley's.

Hence, by the fall of 2013, with three of the four earlier shipments by Hedley's already barred by the 5-year statute of limitations (and the fourth fast approaching the deadline), the government decided to target the Company, and specifically its chief executive, Steve Hedley, in a sting operation – using Polenske as its cooperating agent.

**B.  The Sting Operation**

Beginning in late September 2013, Polenske, acting at the direction of agents, contacted Steve Hedley by email and informed him that his business was about to increase exponentially in volume through a joint venture he was engaged in with Restoration Hardware. PSR page 9; Kates Decl. ¶ 4.  Polenske later arranged for a face-to-face meeting at Polenske's private club in New York City, a meeting surreptitiously recorded by federal agents.  During the meeting,

Polenske emphasized again that he would soon be in a position to offer a lucrative stream of shipping business to Hedley's as part of his affiliation with Restoration Hardware, and a high volume of shipments anticipated from Europe to China.  PSR page 9, Kates Decl. ¶ 4.  After mentioning several times that he was about to become a much larger client of Hedley's, Polenske then tried repeatedly to get Mr. Hedley to say that he would be willing to circumvent the CITES treaty to avoid the administrative hassles it posed for Polenske and his business. It is undisputed that Mr. Hedley had no idea he was being taped.  Yet, despite the lure of lucrative business, Mr. Hedley repeatedly rebuffed Polenske's suggestion, and instead emphasized the need to comply with the CITES regulations.   PSR ¶ 15, Kates Decl. ¶ 5.

### C.  Offense of Conviction – The 2014 Shipment

Despite the exculpatory nature of the secretly-recorded meeting in New York City, the government persisted in trying to persuade Hedley's to falsify paperwork for a shipment containing protected wildlife. In mid-December 2013, Polenske emailed Mr. Hedley to say that he had a volume of items that needed to be shipped from a dealer in Belgium to his store in Yountville.  He said that the shipment would include (among other non-regulated items) two sea turtle shells.  Because sea turtle shells are covered under the CITES treaty, it was necessary to obtain a license prior to shipment.  But because the shells were not more than 100 years old, Polenske said that he did not think it would be possible to obtain a CITES license.  PSR ¶ 16; US_0125, GJ Exh 11.

Polenske suggested that Hedley's might be willing to falsely describe the shells as sculptures, as it apparently had in the past: "In the past, we described Sea Turtle shells, Whale Vertebra, etc. as sculptures and did not have a problem with them being pulled. Thoughts? Any insight would be appreciated." *Id.*   In reply to this request, Stephen Hedley ultimately agreed that Hedley's would provide a false description ("oval sculptures" or something similar) to avoid the CITES restrictions. In a later email exchange the next month, Mr. Hedley agreed to Polenske's additional request to use a false description for a claim shell that was also going to be included in the same shipment. Following these discussions, in late April 2014, Hedley's made

1  the shipment including the two sea turtle shells and the clam shell to the United States, in a
2  single shipping container, using the false descriptions Polenske had requested on the customs
3  documents. PSR ¶ 17

4      This shipment constitutes the single count of smuggling, in violation of 18 U.S.C. § 545,
5  to which Hedley's has pleaded guilty, and for which it now faces sentencing.

### D. The Company's Acceptance of Responsibility, Cooperation, and Enhanced Compliance Program.

Soon after being served with the indictment, Hedley's agreed to accept corporate criminal responsibility and it began cooperating with the government in its ongoing investigation of wildlife trafficking and smuggling.  Even before it entered a guilty plea in this case, the Company made its employees in France and the U.K. available for government interviews and voluntarily provided the government with documents related to its exports to the U.S.  *See* United States' Sentencing Memorandum at 3.

Further, although it has pleaded guilty to only the 2014 incident resulting from the sting operation, Hedley's agreed to accept Polenske's estimate that the combined "market value" of all protected wildlife items it had shipped for Polenske (stretching back to 2006) amounted to $81,442 – a figure that far exceeds the amount Polenske paid to Hedley's to ship the items.  The Company also agreed as part of the plea that these prior shipments may be considered as "relevant conduct" under the guidelines, despite their isolated nature and the fact that they occurred nearly five to eight years before the instant offense.

### III.   GUIDELINES CALCULATION

Hedley's concurs with the guidelines calculations set forth in the PSR, which under USSG § 2Q2.1 yield a total adjusted Offense Level of 16, and a base fine recommendation of $175,000.  *See* USSG § 8C2.4(d).

Because Stephen Hedley, the Company's principal, participated in the offense conduct, two points are added to the Culpability Score under § 8C2.5(b)(4).  Two points are then subtracted for acceptance of responsibility under § 8C2.5(g), leaving a culpability score of 5.

DEFENDANT HEDLEY'S HUMPERS SENTENCING MEMORANDUM
CR 14-00374 WHA

- 6 -

Under USSG §8C2.6, with a culpability score of 5, the recommended fine range is $175,000 to $350,000 – *before* any consideration for the Company's cooperation, or any other statutory sentencing factors under 18 U.S.C. § 3553(a).

## IV.   ARGUMENT

### A Sanction of $100,000 Satisfies the Sentencing Objectives of § 3553(a)

After *Booker*, of course, the Guidelines are merely advisory, not mandatory. They serve as important guideposts meant to inform, but not shackle, district judges as they engage in individualized sentencing.[1] The "overarching statutory charge" under 18 U.S.C. § 3553 is for the court to "'impose a sentence [that is] sufficient, but not greater than necessary'" to achieve the statutory objectives of sentencing. *Carty,* 520 F.3d at 991, *quoting* 18 U.S.C. § 3553(a).

Here, although the total monetary penalty agreed upon by the parties (and endorsed by the Probation Office) is somewhat lower than the guidelines range – $100,000 versus the low-end of $175,000 – it is nevertheless sufficient to achieve the statutory goals of sentencing, particularly given the nature and circumstances of the Company's offense, the lack of significant financial gain to the Company from the offense, and the Company's subsequent cooperation with law enforcement and efforts at improved CITES compliance.

### A.  The nature and circumstances of the offense warrant a below-guidelines fine

There is no evidence to suggest that Hedley's was engaged in a continuous course of illegal smuggling or CITES violations. Rather, the Company's wrongdoing was confined to four isolated shipments between 2006 and 2009 – committed through the actions of a single employee in Paris who agreed to occasional improper requests from a U.S. customer (Polenske) – along with one 2014 shipment that was instigated as part of an undercover sting operation.

Notably, even after flagging shipments for over a year, the only improper shipments uncovered by the government were the five shipments to Polenske at issue here – and all five

---

[1] *United States v. Booker,* 543 U.S. 220 (2005); *Rita v. United States,* 551 U.S. 338 (2007)*; Kimbrough v. United States,* 552 U.S. 85 (2007); *Gall v. United States,* 552 U.S. 38 (2007). *See also United States v. Carty,* 520 F.3d 984, 990 (9th Cir. 2008) (en banc); *United States v. Whitehead,* 532 F.3d 991,993 (9th Cir. 2008).

incidents of improper labeling were made at Polenske's request. This was not some "service" that Hedley's offered to its customers or initiated on its own. This was a series of poor decisions, made simply to placate a customer.

Further, while it is unquestionably wrong to contribute to the illegal trade in endangered wildlife in any fashion, Hedley's was not itself involved in the unlawful purchase, sale, or procurement ("poaching") of the wildlife; instead, it provided transport (albeit with inaccurate paperwork), in much the manner of a common carrier. In contrast to the buyers or sellers of protected wildlife items, a company like Hedley's played a more tangential role in the misconduct. It thus occupies the outer periphery (and lower rungs of culpability) among those the Sentencing Commission likely contemplated when calculating appropriate sentences for wildlife smuggling.

### B. The lack of significant gain to Hedley's is a mitigating factor

It is also noteworthy that Hedley's received no excess profits or special "premium" in exchange for its agreement to use the false descriptions that Polenske requested. Rather, the Company charged Polenske the same amount, strictly according to the volume, collection, and packing requirements for the items in question, and added any administrative and export fees, consistent with its schedule of fees for all other items. PSR page 11.

Under USSG § 2Q2.1, for offenses involving fish, wildlife, and plants, the fine amount corresponds with the *market value* of the items, which the Company agreed was in excess of $70,000, based on Polenske's own estimates. But Hedley's compensation was not tied in any way to the market value of the items. Rather, as a shipper, Hedley's fees were based simply on the physical volume of the items, and any related collection and packing requirements, and administrative and export fees. Based on documents found in Hedley's Paris office reflecting the shipping rates for shipments in the 2006-2009 period, and the current shipping rates applicable to the 2014 shipment, the actual revenue that Hedley's made for shipping all of the protected wildlife items in question was a total of approximately $2595 – far less than the anticipated gain to Polenske. PSR page 11.

DEFENDANT HEDLEY'S HUMPERS SENTENCING MEMORANDUM
CR 14-00374 WHA

- 8 -

### C. The government's decision to target the chief executive served to increase the culpability score and inflate the guidelines fine range.

As noted above, before 2013, Polenske had arranged all of his wildlife shipments through a single employee in Hedley's Paris office. There was no evidence that the Company's principal, Steven Hedley, had participated in any of the earlier improper shipments. Despite this lack of predisposition, the government targeted Mr. Hedley, rather than the Paris employee, in its sting operation. The consequence of this decision was not just to ensnare Mr. Hedley in government-initiated illegal conduct (despite his earlier, expressed reluctance). It also had the effect of increasing the Company's guidelines culpability score by 2 points, because Mr. Hedley was an individual with "substantial authority" who "participated in, condoned, or was willfully ignorant of the offense." USSG § 8C2.5(b)(4). Without this two point bump, the culpability score would have been 3, yielding a multiplier to the base fine of just 0.60 to 1.20, rather than the 1.00 to 2.00 multiplier range for a culpability score of 5.

In other words, had the government simply trained its sting operation on one of Hedley's rank-and-file employees, as was Polenske's normal course of business, rather than its chief executive, the guidelines fine range would have been $105,000 to $210,000. The agreed-upon total monetary penalty of $100,000 is close to the low-end of this range.

### D. A below-guidelines fine is warranted in light of Hedley's history of compliance, its swift cooperation, and efforts to improve CITES compliance.

The history and characteristics of Hedley's provide additional mitigation and support for a below-guidelines fine. Hedley's started in business over forty years ago and has never previously run afoul of the law in any country. Instead, with the exception of the incidents identified here, Hedley's has sought to comply in good-faith with CITES and other applicable import and export regulations worldwide. When the wrongful conduct was brought to light, Hedley's quickly accepted responsibility and cooperated with the government's ongoing investigation of illegal wildlife trafficking from Europe to the United States. Even before entering a plea in this case, the Company made its overseas employees available for government interviews and provided foreign emails and shipping documents to U.S. investigators. The

government, who is best situated to evaluate the significance of law enforcement cooperation, has appropriately recognized the value of this assistance in its recommended sentence.

Further, once the Company recognized that its employees may not all be fully aware of the CITES regulations, Hedley's implemented a more robust compliance program to prevent future violations of the CITES treaty. The Company created and distributed a best practices document to its employees. All relevant staff have now been trained on CITES, instructed on procedures to obtain CITES licenses where appropriate, and warned of the serious risks of violating the CITES treaty. In addition, laminated color charts have been posted at locations where the employees pack objects which illustrate the sorts of items needing CITES licenses. The best practices document also contains more specific guidelines on collection, packing, and shipping of potentially affected items, and about the various categories of protected species under the CITES treaty. Importantly, it also provides contact information for immediate help and advice.

## V.   CONCLUSION

Hedley's Humpers recognizes that its decision to help smuggle protected wildlife parts into the U.S. with false labeling was wrong and indefensible. Such conduct feeds a market demand that threatens the sustainability of endangered species around the globe. The imposition of three years of probation, a monetary sanction of $100,000, and the public stigma of being adjudged a felon in the United States all serve together to reflect the seriousness of Hedley's offense, to provide just punishment in this case, and to furnish adequate deterrence to other similarly-situated companies.

Indeed, the mere fact of the felony conviction has already caused substantial adverse consequences for Hedley's business. In particular, Barclays Bank, the financial institution with whom Hedley's has banked for 40 years, completely terminated its relationship with Hedley's, in light of this felony guilty plea. It terminated multiple business accounts, loan accounts, and finance facilities; and, it terminated Mr. Hedley's personal accounts. Several other major banks

1 have also refused to provide banking services for Hedley's based on its guilty plea  To date,
2 Hedley's has not found another bank that will accept it as a client.  *See* Kates Decl. ¶ 7.

                                         *   *   *

4        For all the foregoing reasons, Hedley's Humpers respectfully requests that the Court
5 impose the sentence agreed to in the binding Rule 11(c)(1)(C) plea agreement and endorsed by
6 the Probation Office: a term of three years of probation; a $75,000 fine; a $25,000 community
7 service payment; and a $400 special assessment. Such a sentence would be "sufficient, but no
8 greater than necessary" to achieve the statutory objectives set forth in 18 U.S.C. §3553(a).

9 Dated:  June 30, 2015                         Respectfully Submitted,

10                                               RAMSEY & EHRLICH LLP

12                                               //s//

13                                               MILES EHRLICH
                                                 KATHARINE KATES
14                                               *Attorneys for Defendant Hedley's Humpers*